*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Malik C. BUNTON**
Corporal (E-4), U.S. Marine Corps
*Appellant*

**No. 202100001**

_____

Decided: 30 June 2022

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Jeffrey V. Muñoz (arraignment and motions)
John P. Norman (motions and trial)

Sentence adjudged 12 September 2020 by a general court-martial convened at Marine Corps Air Ground Combat Center Twentynine Palms, California, consisting of members with enlisted representation. Sentence in the Entry of Judgment: reduction to E-1, confinement for two years, forfeiture of all pay and allowances, and a dishonorable discharge.

For Appellant:
*Lieutenant Commander Megan P. Marinos, JAGC, USN*

For Appellee:
*Lieutenant Megan E. Martino, JAGC, USN*
*Major Kerry E. Friedewald, USMC*

Chief Judge MONAHAN delivered the opinion of the Court, in which Senior Judge STEPHENS and Judge DEERWESTER joined.

————————————

**PUBLISHED OPINION OF THE COURT**

————————————

MONAHAN, Chief Judge:

Appellant was convicted of sexual assault and abusive sexual contact [committed against Ms. Foxtrot[1]], conspiracy to commit extortion [committed against a different female victim], failure to go to his appointed place of duty, and false official statement in violation of Articles 120, 81, 86, and 107 Uniform Code of Military Justice [UCMJ].[2]

Appellant asserts eight assignments of error [AOEs], which we renumber as follows: (1) the military judge erred when he denied Appellant's civilian defense counsel's [CDC's] continuance requests, effectively denying Appellant his right to counsel of his choice; (2) the taint of systematic exclusion of junior enlisted Marines as potential panel members was not alleviated when two Corporals junior in date of rank to accused were added to the list of potential members; (3) the military judge's finding instructions to the members that they could convict with a non-unanimous vote violated Appellant's rights under the Sixth Amendment to the Constitution of the United States in light of *Ramos v. Louisiana*;[3] (4) after conducting an in camera review of Ms. Foxtrot's medical and Physical Evaluation Board records, the military judge erred by withhold-

———————————————

[1] All names used in this opinion, except those of the judges, appellate counsel, and Appellant are pseudonyms.

[2] 10 U.S.C. §§ 920, 881, 886, and 907.

[3] 140 S. Ct. 1390 (2020). We have reviewed this assigned error and find it to be without merit. *United States v. Matias*, 25 MJ 356, 363 (C.M.A. 1987); *United States v. Causey*, __ 80 MJ ___, No. 202000228, 2022 CCA LEXIS 176 (N-M. Ct. Crim. App. March 23, 2022).

ing documents from the Defense that contained information related to her prescription pain medication; (5) this Court violated Appellant's appellate due process rights by denying his request to review sealed materials; (6) the military judge erred when he denied Appellant's motion to compel the testimony of a forensic psychiatrist as a witness on his behalf at trial; (7) Appellant's trial defense counsel [TDC] were ineffective in failing to move to suppress Appellant's statements to the Naval Criminal Investigative Service [NCIS] concerning the alleged sexual assault and abusive sexual contact of Ms. Foxtrot; and (8) Appellant's conviction for false official statement is factually insufficient. We find merit in Appellant's sixth AOE, set aside his convictions for sexual assault and abusive sexual contact as well as the sentence, affirm his remaining convictions, and authorize a rehearing.[4]

# I. BACKGROUND

## A. Ms. Foxtrot Accuses Appellant of Sexual Assault and Abusive Sexual Contact

Ms. Susan Foxtrot, a Marine Corporal [Cpl] (E-4) at the time of the events in question, had been assigned to the Installation Personnel Administration Center [IPAC] at Marine Corps Air Ground Combat Center Twentynine Palms, California [MCAGCC]. She and other members of her command travelled to San Diego, California, during the weekend of 15-17 March 2019 to celebrate St. Patrick's Day and to say farewell to Sergeant [Sgt] (E-5) Gina Victor, who was preparing to transfer to a new duty station. Ms. Foxtrot drove to San Diego by herself. However, Ms. Foxtrot shared a hotel room, containing two beds, with Appellant and Sgt Victor for the weekend.

On Friday evening, Appellant, Sgt Victor, and Ms. Foxtrot went out drinking with other members of the command at bars in San Diego. When they returned to the room later that evening, Appellant slept in one bed, and Ms. Foxtrot and Sgt Victor slept in the other.

On Saturday, Ms. Foxtrot and Sgt Victor spent the day shopping and sightseeing and returned to the hotel room where they met up with Appellant. At the room, the three Marines ordered a pizza and got ready to go out for the evening. Ms. Foxtrot and Sgt Victor drank "a few"[5] beers before they left the hotel. Appellant, Ms. Foxtrot, and Sgt Victor then went out to bars and clubs where they met up with additional members of their command. In addition to

---

[4] Although rendered moot by our resolution of AOE VI, we review AOEs IV, V, and VII for reasons of judicial economy.

[5] R. at 1490.

the beers she drank before leaving the hotel, Ms. Foxtrot drank a number of other alcoholic drinks, including vodka mixed with caffeinated energy drinks, throughout the night. Although the exact number of drinks she consumed is unknown, her alcohol consumption that evening resulted in her getting intoxicated, but not extremely so. She had her last drink at about 0200 on Sunday.

Eventually, Ms. Foxtrot decided to leave the group and attempted to meet up with Sgt Fish, with whom she was pursuing a romantic relationship. After her efforts did not work out, she gave up and returned to the hotel by herself. However, Ms. Foxtrot did not have a key for the room, which meant that she could not access the elevator or the room itself. Frustrated, Ms. Foxtrot unsuccessfully attempted to call and text Sgt Victor, and then contacted Appellant via Snapchat. Appellant's advice on how Ms. Foxtrot could gain a key from the front desk proved to be unhelpful, and she waited in the lobby until the front desk employee eventually agreed to give her a key that gave her access to use the elevator. After pounding on the door to the room, Sgt Victor eventually let her in sometime between 0300 and 0500.[6] Once inside, Ms. Foxtrot spoke briefly with Sgt Victor, changed her clothes, and went to sleep in the room's empty bed – the one unoccupied by Sgt Victor, who had returned to sleep.

Ms. Foxtrot testified that she had no memory of when Appellant returned to the room,[7] when he got into bed with her, or when he engaged in sexual activity with her while they were both lying in bed. Rather, her first memory was waking up in the morning with him next to her in bed with his arm around her and spooning her. Confused about why he was doing that, Ms. Foxtrot rolled over, pushed him away and asked him what he was doing. In response, Appellant giggled and said "What?" which she understood as him indicating that he was not doing anything wrong.[8]

A short while later, Ms. Foxtrot got out of bed and checked her cell phone. There, she found Snapchat messages from Appellant in which he told her that he had "rubbed on" her the night before, as well as commenting on how big he thought her breasts were, the fact that he had "fingered" her, and how "wet"

---

[6] Ms. Foxtrot's and Sgt Victor's testimony diverged with regard to what time Sgt Victor awoke to banging on the door and let Ms. Foxtrot into the room. Ms. Foxtrot testified that it was "almost [0500]" but Sgt Victor testified that it was between 0300-0400. R. 1499, 1607.

[7] The evidence established that Appellant returned to the room shortly after 0500.

[8] R. at 1549.

she had been.[9]  When asked by trial counsel on direct examination how she felt after she had read this she testified:

> I was confused again. I don't really believe it, and like, there's no way. I would've woken up as someone did this to me. I, kind of, just ignored it. It was like weird and awkward, but I, like, also don't believe it, so I was trying not to pay any mind to it.[10]

Ms. Foxtrot went to the bathroom, called Sgt Fish, and had a conversation with him. She then showered, got dressed, and shortly thereafter left the hotel before Appellant and Sgt Victor. Later that day, she drove back to her barracks at Twentynine Palms.

The next day, Appellant messaged Ms. Foxtrot. Referring to her nipples being pierced at the time, he said, "I didn't know you had them done."[11] This shocked her and led her to believe that maybe he had engaged in sexual activity with her as he said he had done in his previous messages to her. Later that same day, he messaged her again and repeated the sexual activity that he had engaged in with her, but this time was asking her, "Do you remember?"[12] She responded by telling Appellant that she did not remember, and, thus, did not know why the sexual activity had happened. Ms. Foxtrot talked to her roommate about the situation, who opined that she had been sexually assaulted.

Subsequently, Ms. Foxtrot made a restricted report of sexual assault to her staff sergeant who was also a uniformed victim advocate. After speaking with her assigned victims legal counsel, she decided to go forward with an unrestricted report. Then, after being interviewed by NCIS agents, she agreed to participate in a controlled text message with Appellant.

During that text conversation, Ms. Foxtrot directly asked Appellant what he did to her and asserted that she did not know because she had been asleep. Appellant acknowledged that he "fingered" her and touched her breasts after he returned to the hotel around 0500.[13] However, he maintained that the sexual activity was consensual and expressly denied taking advantage of her while she was sleeping. He explained, "I said…can I rub on you and you said yea [sic]

---

[9] *Id.* at 1504.

[10] *Id.*

[11] *Id.* at 1506.

[12] *Id.* at 1507.

[13] Pros. Ex. 1 at 5.

go ahead."[14] He also rejected Ms. Foxtrot's response that he was lying and said, "I wouldn't just touch you without asking[.] [T]hat's with any girl[.] That's some creeper s**t if I just started touching you lol[.]"[15] Appellant also explained why he had previously told Ms. Foxtrot "sorry": "I said sorry because the next day [because] you seemed like you never wanted me to do it[.] That's why I said sorry[.] I'm not lying tho[.] [sic]"[16] When she persisted that he was lying and asked him to tell her the truth, he replied, "I am telling you the truth[.] I didn't just start touching you[.]"[17]

At the end of the controlled text conversation, Appellant and Ms. Foxtrot engaged in the following exchange regarding whether he was lying when he had denied that she was sleeping when he engaged in sexual activity with her:

| | |
|---|---|
| ACC: | [Ms. Foxtrot,] how are you gonna tell me I'm lying if you said you were sleeping lol |
| Ms. Foxtrot: | Yeah I was sleeping so how could I have said yes to you? I didn't? |
| | I know I was sleeping so I know I didn't say anything to you therefore you decided to touch me without me saying yes |
| ACC: | Okay |
| | I don't know what you want me to say or do like I'm really not lying to you that's what's making me just like it's whatever. Cause if the shoe was on the other foot I wouldn't be telling you that you are lying when I truly don't even know what [happened] |
| | I'm just over it you don't have to be cool with me cause that situation is long and gone. I'll leave you alone and I just won't talk to you as you wish |
| Ms. Foxtrot: | Then why did you ask on Snapchat if I remembered what you did to me? |

---

[14] *Id.* at 9.

[15] *Id.*

[16] *Id.* at 10.

[17] *Id.* at 13.

> You asked cause you knew I was sleeping
>
> You texted me in the morning telling me that you fingered me cause you knew I didn't know what you did

ACC:
> I knew you were sleeping
>
> But I'm wrong cause you said I could?
>
> That's why I asked if you remembered cause I was gonna see if we could do something else lol
>
> But you got so mad so I was just like let me leave it alone[18]

Four days after the controlled text conversation, Appellant was brought to the NCIS office at Twentynine Palms, where he remained for over five hours. While there, he was interrogated by Special Agent [SA] David Mike and another agent. Throughout the interrogation, Appellant maintained that although he did engage in sexual activity with Ms. Foxtrot, she had consented to it.

**B. Continuance Requests and Appellant's Release of Civilian Defense Counsel**

Appellant's trial was originally docketed for 12-15 May 2020 onboard MCAGCC. In late-March 2020, the Government was in the process of securing travel for multiple witnesses from international locations to California for trial. March 2020 was also the advent of the COVID-19 global pandemic in the United States. On 11 March 2020, the Department of Defense [DoD] promulgated travel restrictions and force health protection guidance directives which strictly limited travel for all DoD personnel. Shortly thereafter, the Secretary of Defense issued a stop-movement order for all domestic travel, PCS travel, and leave beyond the local area which was in effect until 11 May 2020.

In response to these strictures, as well as additional stop movement guidance from Headquarters Marine Corps, trial counsel and Appellant's military defense counsel filed a joint motion requesting a continuance of trial. In their joint motion, the parties specifically highlighted the difficulty of executing international travel for three Government and Defense witnesses, as well as the

---

[18] Pros. Ex. 1 at 15-17.

challenges in gathering the personnel required for court-martial into a confined space.[19] Accordingly, the military judge issued a written ruling continuing Appellant's trial to 18-20 June 2020.[20]

On 20 April 2020, the Secretary of Defense reissued and extended the stop-movement order, which was then put into effect until 30 June 2020. Concurrently, MARADMIN 254/20 was released and directed stop-movement for domestic and international travel until 30 June 2020, in order to limit the continuing spread of COVID-19. Trial counsel and Appellant's military defense counsel then filed a second joint motion requesting a continuance of trial to 3-7 August 2020.[21] In their motion, the parties again cited concerns about their ability to facilitate Appellant's court-martial in a manner compliant with the regulations promulgated by the DoD. Specifically, the parties pointed to difficulties effectuating witness travel to, and approval to come aboard, MCAGCC, in addition to concerns over "maintaining eighteen individuals in a confined space for an extended period of time."[22] The military judge granted the continuance and reset the dates of trial to 3-7 August 2020.

On 16 July 2020, 18 days prior to the start of Appellant's court-martial, Appellant hired civilian counsel to represent him at his trial. On the same day, CDC filed a notice of appearance with the court and a written motion for continuance of trial.[23] In her motion, CDC requested that Appellant's court-martial be continued to 26 October 2020, so that she may have time to prepare for trial. In her continuance motion, CDC stated that she was unavailable the week of 3-7 August 2020 due to other scheduled commitments and that she had not yet been provided any discovery for the case. CDC argued that, "[t]o deny the continuance would result in the accused being deprived his counsel of choice."[24] The following day, CDC filed a declaration in support of the continuance motion.[25] In the declaration, CDC again emphasized that she had not yet

---

[19] App. Ex. XXXV at 4-5.

[20] *Id*. at 6.

[21] App. Ex. LIX.

[22] App. Ex. LIX at 4-5.

[23] App. Ex. LXV.

[24] App. Ex. LXV at 4.

[25] App. Ex. LXVI.

received any of the evidence in Appellant's trial[26] as well as provided the military judge with an outline of her obligations including:

- 27-31 July 2020, [the week prior to trial,] travel to Jacksonville, FL

- 3-7 August 2020, [the week of trial,] travel to Jacksonville, FL

- 5 August 2020, two clemency and parole appearances

- 7-17 August 2020, a preplanned family vacation

- 17-21 August 2020, a one day guilty plea in Fort Irwin, CA, an administrative separation board in San Diego, CA, motions due in a third matter, and two appellate briefs due in a fourth case

- 24-28 August 2020, an Article 39(a), UCMJ, motions hearing followed by a trip to take her son to college until early September

- 2 September 2020, a parole hearing

- 8 September 2020, an administrative separation board

- 14-18 September 2020, a contested general court-martial in another case[27]

CDC argued that due to the foregoing schedule, she would be unable to prepare for Appellant's court-martial until late September. Appellant also filed a declaration in support of the continuance motion, stating that he "retained the services of civilian defense counsel . . . as soon as [his] family and [he] were able to gather the financial funds" to retain her.[28] Appellant stated that he was aware that CDC was unavailable for trial from 3-7 August and was willing to have his trial delayed so that CDC may represent him, along with all three of his military defense counsel.

Victim's Legal Counsel [VLC] for Ms. Foxtrot filed a response in opposition to Appellant's continuance request, arguing that Appellant had not met his burden by a preponderance of the evidence to demonstrate that continuance was warranted.[29] VLC stated that a continuance of over two months, on top of the prior three months of continuances due to COVID-19 restrictions, would

---

[26] We note that the Government had previously provided discovery to Appellant's team of military defense counsel. At the time of filing, CDC had not yet received evidence from either the Government or her defense counsel colleagues.

[27] App. Ex. LXVI at 1-3.

[28] App. Ex. LXIX at 1.

[29] App. Ex. LXVII.

prejudice her client by delaying the opportunity to move on with her life. VLC further posited that CDC's conflicts with Appellant's trial dates were known at the time he had retained her, and that Appellant should not be granted a continuance until October simply because he hired civilian counsel.

The Government also filed a response in opposition to Appellant's continuance request.[30] The Government first echoed VLC, noting that both Appellant and CDC were aware of the date of trial at the time they came to an agreement on representation. The Government argued that there was no new evidence or surprise that would necessitate additional time to prepare a defense. Again citing to evolving guidance in response to COVID-19, the Government argued that a continuance may negatively impact their ability to secure international travel for witnesses. The Government additionally posited that an important government witness would have reduced availability after 21 September 2022 due to operational requirements. Ultimately, the Government asked the court to deny the continuance request in its entirety, and in the alternative, requested the court to reschedule the trial to dates earlier than those requested by the Defense, to include the weeks of 10 August, 17 August, 24 August, or 7 September.

After hearing argument on the continuance motion, the military judge found that an insufficient opportunity to prepare for trial was a valid basis for a continuance request under R.C.M. 906(b)(1) and that Appellant had sustained his burden of proof by a preponderance of the evidence. After weighing the factors set forth in *United States v. Miller*,[31] the military judge granted a 35-day continuance and Appellant's court-martial was rescheduled for 7-11 September 2020.

That same day, CDC filed a motion for reconsideration with the court. In the motion, CDC reiterated the timeline of her representation and her scheduling conflicts, then raised a new argument: that the military judge erred in only granting a partial continuance because prior criticism of military defense counsel by the military judge required increased diligence on the part of CDC. Specifically, CDC referred to two emails between the military judge and the parties on 2 and 3 July 2020. In those emails, the military judge criticized filings by the military defense counsel and suggested that they acted "negligently," cautioned them that they were officers of the court and not to "com-

---

[30] App. Ex. LXVII.

[31] *United States v. Miller*, 47 M.J. 352, 358 (C.A.A.F. 1997).

promise [their] license to practice law," and suggested that counsel were "either unaware of [R.C.M.] 707 or planting poison pills in the record."[32] Thus, CDC argued the military judge's chastisements of the military defense counsel implicated Appellant's right to competent counsel and required CDC to "review all motions, responses, and court rulings to determine if they are factually and legally sufficient, and to ensure all legal issues in this case have been adequately raised by military counsel."[33]

CDC further argued that this case was similar to *United States v. Wiest*, where comments made by the military judge to military defense counsel in an Article 39(a), UCMJ, session caused the appellant to fire his detailed counsel.[34] There, the military judge granted a continuance to allow new military defense counsel to prepare for the case, but during that time the appellant also hired civilian defense counsel to represent him. The appellant's new civilian defense counsel was unavailable for trial during the scheduled dates. The Court of Appeals for the Armed Forces [CAAF] found that the military judge abused his discretion for failing to grant a second continuance to allow the appellant to obtain a civilian lawyer.[35]

The Government did not file a response to CDC's motion for reconsideration and the military judge issued a written ruling without hearing further argument.[36] In his ruling, the military judge reasoned that the *Miller* factors were unchanged and that *Wiest* was clearly distinguishable from Appellant's case because, unlike in *Wiest*, the military judge's comments to counsel were over email and not made before the accused. The military judge also found no evidence in the record to support an inference that there was a causal relationship between the military judge's castigations and Appellant's decision to retain civilian counsel. He found that Appellant's own declaration cut against this argument because Appellant stated that the timing of his decision to retain civilian counsel was contingent upon gathering the funds necessary to do so and that Appellant wished to be represented by CDC *and* his military defense counsel. The military judge reasoned that the emails cited by CDC ignored the over 20 motions filed by military defense counsel in support of their client and em-

---

[32] App. Ex. LXX at 12, 13.

[33] App. Ex. LXX at 6.

[34] 59 M.J. 276 (C.A.A.F. 2004).

[35] *Id.* at 276.

[36] App. Ex. LXXI.

phasized that Appellant's military counsel had been "aggressively and affirmatively filing motions on behalf of their client's defense."[37] Ultimately, the military judge found the Appellant maintained confidence in his detailed military defense counsel and that "the Defense has failed its burden by a preponderance of the evidence to demonstrate that the Court should reconsider its . . . ruling . . . wherein the Court granted a Defense continuance request, in part."[38]

On 14 August 2020, CDC filed a second motion requesting a continuance of Appellant's trial to 19 October 2020.[39] CDC noted that at the time of filing, she had reviewed approximately 850 of the 1442 pages of discovery and 1 of 6 videos. CDC also pointed to several videos and electronic evidence contained in the remaining pages, as well as over twenty motions, that she had not yet reviewed. Referencing her prior arguments, CDC also noted that her review had led her to file "two motions for appropriate relief which were not filed by military defense counsel" and noted that she had identified additional matters requiring the filing of future motions.[40] Further, CDC pointed to additional discovery and production of witnesses being necessary. CDC argued that these factors, coupled with her aforementioned obligations, necessitated a continuance in order to effectuate competent representation. The Government filed a response reiterating that a continuance until October would result in key witnesses not being available for trial, would potentially cause further issues in securing witness travel due to evolving COVID-19 guidance, and that Appellant had not met his burden of proof by a preponderance of the evidence that a further continuance was necessary.

The military judge[41] denied the motion for a second continuance, and the trial remained docketed for 7-11 September 2020. In his supplemental ruling, the military judge highlighted that none of the motions mentioned by CDC were ever filed with the court. Further, the military judge emphasized that at no time had Appellant indicated that he no longer wished to be represented by any of his military defense counsel. The military judge also noted that on 28 August 2020, the convening authority withdrew and dismissed 8 of the 13 charged specifications, simplifying the matters to be resolved at trial significantly. Reviewing the *Miller* factors, the military judge determined that: (1)

---

[37] *Id.* at 10

[38] *Id.* at 11.

[39] App. Ex. LXXII.

[40] App. Ex. LXXII at 4.

[41] Due to his impending retirement from active duty, Judge Muñoz was replaced as the military judge in Appellant's case by Judge Norman on 11 August 2020.

there was no surprise that affected civilian counsel; (2) the nature of the evidence involved in the case had not changed since arraignment; (3) Appellant's most recent continuance motion was not timely as nothing had substantively changed since the court had ruled on Appellant's prior continuance motions; (4) making the Government rearrange travel once more while losing an expert witness would be unreasonable; (5) the length of the requested continuance was unreasonable given the substantial motions litigation that had already been accomplished in the allotted time; (6) the Government would be prejudiced by an additional continuance; (7) asking the court a third time to continue the trial with no change in circumstances did not appear to be a good faith request; (8) the Defense had not demonstrated reasonable diligence after a new trial date was set in response to Appellant's initial continuance request; (9) there would be virtually no impact on the verdict if the continuance was denied; and (10) Appellant and his counsel had prior notice of the trial dates at all times.

After the military judge provided counsel with notice that he had denied Appellant's most recent continuance request, on 26 August 2020, CDC filed a motion to be excused from further representation of Appellant.[42] She stated in the motion that Appellant wished to release her due to her inability to be prepared for trial on 7 September 2020. Attached to the motion was the following declaration by Appellant:

> I hereby release you as my retained civilian counsel in my general court-martial case scheduled for trial on 7 September 2020.
>
> Based on the military judge's denial of the continuance request you filed on my behalf, and your inability to be present at trial to provide effective representation of me, I do not desire to be represented by you at this time. Due to your conflict in adequately preparing for and representing me at trial, I release you from further representation in my case.
>
> If the military judge had granted the continuance until October as you had requested on my behalf, I would not be in a position to have to release you.[43]

---

[42] App. Ex. LXXVII.

[43] App. Ex. LXXVII at 5.

On 28 August 2020, the military judge denied CDC's motion to withdraw from representing Appellant. The military judge supplemented his ruling at a hearing on 7 September 2020. In his ruling, the military judge took issue with language in Appellant's letter purporting to release CDC, specifically that he was "in a position to have to release" her.[44] The military judge found that such language indicated that Appellant's release of CDC was neither voluntarily nor freely given and stated that Appellant "can keep his CDC, whom the Court has found has enough time and resources in this case to be adequately prepared…[i]f the accused desires to freely and voluntarily released his CDC…[that] would need to be discussed on the record with the military judge, with all counsel present."[45]

On 7 September 2020, during an Article 39(a), UCMJ, session, the military judge emphasized that the language used by the accused in his initial declaration on the matter indicated that his release of counsel was involuntary and explained that Appellant could not be forced to release CDC.[46] However, shortly before the Article 39(a), UCMJ, session the Defense submitted a new declaration from Appellant, dated 6 September 2020, releasing CDC from representation.[47] In this letter to CDC Appellant asserted:

> I release you from my case as you have not adequately prepared
> for trial and I do not wish to be represented by you at this time
> since you are not ready to effectively represent me. My release
> of you is voluntary. I am not being forced to release you as my
> counsel.[48]

After ruling that Appellant's initial attempt to release CDC was involuntary, and thus void, the military judge addressed the issue again in light of the new release letter that had been submitted to the court. Specifically, he engaged in a colloquy with Appellant, and began by thoroughly explaining the issue to Appellant, who indicated that he completely understood the requirement that any release of counsel be voluntary. Appellant also expressed a complete understanding of why the prior request to release CDC was denied.[49] The

---

[44] App. Ex. LXXIX at 1.

[45] App. Ex. LXXIX at 2.

[46] R. at 832.

[47] App. Ex. CX.

[48] *Id.*

[49] R. at 902-908.

14

military judge also explained to Appellant that, because he had already determined the prior request to release CDC was involuntary, Appellant would have to explain what changed from the previous request and why his new declaration releasing CDC was voluntary this time.[50] During the following exchange, the military judge also explained the consequences of a voluntary release of CDC on any appeal:

> MJ: Okay, now the third thing you need to be aware of and be advised of is that if you make a purely voluntary decision to release [CDC], that will make the continuance issue moot on appeal, or make it moot at this court at the trial level, and it'll make it moot on appeal, and that's just a consequence of your decision. That's just one [thing] that you need to know about. You need to be informed of, be aware of, and make the decision knowing that nonetheless, okay?
>
> ACC: Yes, sir.
>
> MJ: Because here's the thing. If she's taken off the case by you, you're the driving force behind that, the voluntary decision is that you want her released, then her level of preparation is irrelevant because you've decided that you don't want her on the case of the voluntary reason, okay? And if her level of preparation is irrelevant because you voluntarily decided to take her off the case, you would be choosing to do that, nothing else will be forcing that, and then that would be the end of it. She just wouldn't be counsel because of your choice, and then any issue with respect to her being able to be prepared would be gone, Okay?
>
> ACC: Yes, sir.
>
> MJ: So this Court would find that the issue of the continuance is moot at the trial level, and there's a high likelihood that that would get no appellate review, should appellate review even be required in your case, and you need to be aware of the consequences if you make the decision.

---

[50] R. at 908-09.

15

|        | Do you understand that? |
|--------|-------------------------|
| ACC:   | Yes, sir.               |
| MJ:    | Do you have questions for me about any of those issues. Especially that last one because it involves a legal issue? |
| ACC:   | Not right now…No, sir.   |
| MJ:    | Okay. Very well.        |
|        | And just for the record, in my discussion so far with the accused, he seems like a very intelligent person. [He is] making great eye contact with me, he's nodding along as I'm speaking to him…he seems very confident in this, and doesn't seem -- he seems to completely understand what the Court is saying and doesn't have any questions.[51] |

After a recess, the Article 39(a), UCMJ, session came back to order. Appellant then indicated he conferred with his defense counsel during the recess on the issue of recusal. Appellant also stated on the record that he wished to "voluntarily" release CDC because he felt that she was not "prepared enough" to represent him.[52]

The military judge then orally provided Appellant a complete explanation of his right to counsel.[53] Appellant indicated that he understood his rights and wished to be represented only by his military counsel and did not wish to be represented by any other counsel. Appellant explained that he had enough time with his military defense counsel to prepare for trial, that he was confident in the work of his military defense counsel, and that he did not feel that CDC was prepared enough to represent him. The military judge then inquired into the voluntariness of Appellant's release of counsel. Appellant again clarified that CDC was not "going to be able to prepare for his trial as [he] wanted her to" and that he did not feel like he had been involuntarily put into that position.[54] The military judge clarified that point as follows:

---

[51] R. at 909-11.

[52] R. at 912.

[53] R. at 912-13.

[54] R. at 916.

MJ: Do you feel like you've been forced into the position?

ACC: No, sir.

MJ: Do you feel like you're being compelled in any way to make this decision?

ACC: No, sir.

MJ: Is this, in fact, a free and voluntary decision on your part?

ACC: Yes, it is, sir.

MJ: Has anyone or anything forced or compelled you in any way to release her?

ACC: No, sir.

MJ: Do you realize that you could keep her if you wanted to?

ACC: I do realize that, sir.

MJ: Do you understand that the Court has found that she could be of some benefit to you?

ACC: Yes, I do, sir.

MJ: We talked about this before, do you understand that your voluntary release of her will likely make your continuance motion unreviewable on appeal, if there is one in this case?

ACC: Yes, I understand, sir.

MJ: Very clearly, do you want to proceed with just your [three military defense counsel] representing you?

ACC: Yes, I do, sir.

MJ: Now, taking into account everything that we talked about on this issue, do you still want to release [CDC]?

ACC: Yes, I do, sir.[55]

---

[55] R. at 917-18.

Following the colloquy with the military judge, the military judge ruled "that the accused, after being fully informed of and understanding his right to counsel, has freely, expressly, and voluntarily requested the excusal of [CDC] as his retained civilian defense counsel, and the Court will honor the accused's request; thus [CDC] is excused."[56]

**C. Members Selection**

The Convening Authority for Appellant's case was the Commanding General of the MCAGCC, located in Twentynine Palms, California. MCAGCC primarily has one subordinate unit: Headquarters Battalion [HQBN]. Generally, all of the Marines assigned as MCAGCC staff are members of HQBN even though they might fall into different sections. The Convening Authority's staff judge advocate [SJA] delegated to his deputy [DSJA] the task of preparing a member selection package for the Convening Authority's consideration in Appellant's court-martial.

With regard to the general process he used for preparing member selection packages, the DSJA would solicit member's questionnaires from the HQBN, compile those questionnaires into a list, and the list and questionnaires would be forwarded to the Convening Authority to assist with the selection of members. In the instant case, the DSJA followed this same process. After obtaining the current file of questionnaires from the HQBN, the DSJA reviewed the files for obvious conflicts and removed from the list the investigating officer in Appellant's case, the legal officer from HQBN, and several members of the Legal Services Support Team at Twentynine Palms. The DSJA then asked the HQBN adjutant to screen the remaining personnel on the list for unavailability due to orders, leave, or liberty. The adjutant did so, and returned the list to the DSJA.

At this juncture, the DSJA realized that the list only contained staff noncommissioned officers [SNCOs] (E-6 and above enlisted personnel) and officers, so he placed a call to the adjutant. It was during this phone call that he first learned of a HQBN policy whereby only SNCOs and officers were required to complete a member's questionnaire as part of their unit check-in procedures. The collection of questionnaires in this manner was done as routine practice and was not connected to any specific court-martial. The DSJA then asked the

---

[56] R. at 918-19.

adjutant to provide questionnaires from "NCOs [Non-Commissioned Officers],[57] specifically Corporals" or words to that effect.[58] The DJSA knew that the accused was a Corporal and wished to "give the Convening Authority a complete range of potential members to consider in accordance with Article 25, UCMJ."[59] The adjutant had two Corporals fill out the questionnaires and sent them to the DSJA for inclusion in the package.

The final list of proposed potential members was composed of 48 nominations: two E-4s, nine E-6s, twelve E-7s, three E-8s, one E-9, one Warrant Officer [WO], three Chief Warrant Officer-2s [CWO-2s], one Chief Warrant Officer-3 [CWO-3], one O-1, five O-3s, seven O-4s, and three O-5s. This list of names and accompanying questionnaires was provided to the Convening Authority along with the SJA's Article 25, UCMJ, advice memo and a memo prepared for the Convening Authority with fifteen (15) blank spaces to be used by him to select the members that he wanted to sit on Appellant's court-martial. The Convening Authority returned a handwritten list of names to the SJA who placed those names on the final court-marital convening order, which ultimately contained: three E-6s, four E-7s, one E-8, one E-9, one CWO-3, one O-3, two O-4s, and two O-5s.

It was later discovered that the two Corporals who were provided to the Convening Authority for consideration were junior by date of rank to Appellant. The military judge found, and we agree, that there was no evidence that Appellant's date of rank vis-à-vis the two Corporals was ever discussed among the SJA, DSJA, HQBN adjutant, or the Convening Authority, or that this differential in the dates of rank played any role in the members selection process.

During pretrial litigation, Appellant challenged the member selection process pursuant to Article 25, UCMJ,[60] and requested that "a new panel be constituted."[61] In his motion, Appellant argued that his court-martial was subject to unlawful command influence because the member panel was improperly stacked against him. Specifically, Appellant argued that the composition of the panel was disproportionately senior in rank to him and that the Convening Authority refused to consider E-4s, E-5s, O-1s, and O-2s as potential members of the court-martial. The Government opposed Appellant's motion, arguing

---

[57] In the U.S. Marine Corps, Corporals (E-4s) and Sergeants (E-5s) are considered NCOs.

[58] R. at 953-54.

[59] App. Ex. XCIX.

[60] 10 U.S.C. § 825.

[61] App. Ex. XCVIII at 9.

that there was insufficient evidence to support the unlawful command influence allegation and that the Convening Authority followed a proper process for member selection.

The military judge denied Appellant's motion. Describing it as a "close call," the military judge found that the Defense had raised "some evidence" on the issue of improper member selection, because the HQBN maintained a policy of only having SNCOs and officers fill out questionnaires, the SJA's office apparently used those questionnaires as a means of putting together a pool of members for the Convening Authority to select from, and no NCOs were ultimately selected to sit on this panel.[62] However, the military judge ultimately concluded that Article 25, UCMJ, was not violated because there was no systematic inclusion or exclusion of potential members based on impermissible criteria, there was nothing wrong with the final panel selected, there was no wrongful intent present on the part of the HQBN, the staff judge advocates, or the Convening Authority, and there was no evidence of bad faith or misconduct related to selecting members for this case.

## D. Military Judge's and this Court's In Camera Reviews of Ms. Foxtrot's Medical & Physical Evaluation Board Records

After enlisting in the Marine Corps, Ms. Foxtrot injured her ankle which developed into a chronic injury for which she had surgery in 2018. She had been prescribed various pain medications because the narcotic painkillers did not work well for her. During a pretrial interview with the Government, she asserted that she was not on pain medication at the time of the incident involving Appellant.

During the pretrial phase of the court-martial the Defense requested, among other things, Ms. Foxtrot's medical and physical evaluation board [PEB] records. When the Government refused to produce these records, the Defense brought a motion to compel them. At oral argument, the Defense argued that it had reason to believe that Ms. Foxtrot was on prescription medications around the time of the charged sexual assault, and therefore it ought to receive her medical records that showed what medications were actively prescribed to her on the date of the incident. The military judge found it a "relevant area of inquiry" if a "complaining witness . . . or any percipient witness, was under the influence of any substance which had the potential to impair their ability to observe the events that they say they observed, their ability to

---

[62] App. Ex. CXXXV at 8.

accurately store those memories, their ability to recall those memories."[63] The military judge concluded, "Those are all ripe areas for cross-examination. The defense is certainly entitled to that information."[64] Consequentially, the military judge ordered the Government to produce Ms. Foxtrot's medical records to the Defense.

With regard to Ms. Foxtrot's PEB records, the Defense stressed to the military judge that she went through the medical separation process before the charged incident. Thus, they argued that there was potential information relating to medications she was prescribed at the time of the alleged misconduct. Ultimately, the military judge also ordered the Government to inform the court and the Defense if such records existed. He further explained that if such records did exist, he would consider conducting an in camera review of them to determine what, if any, records should be disclosed to the parties.

Subsequently, the Defense moved the military judge to compel the production of its expert consultant in the field of forensic psychiatry at trial as an expert witness, U.S. Air Force Captain [Capt] (O-3) Dr. Juliet. [Discussed in detail *infra*.] As part of that motion, the Defense explained to the military judge that their expert consultant had advised the defense team on the impact of alcohol on memory generally. Dr. Juliet had also informed TDC that he needed to review Ms. Foxtrot's medical records to determine how any medications she was taking at the time of the incident, may have affected her memory or state of mind during the alleged offense, particularly considering the amount of alcohol Ms. Foxtrot consumed that evening. However, in its response to the Defense motion to compel the production of Dr. Juliet as an expert witness, the Government argued, that "while Ms. [Foxtrot] was prescribed medication, there is no evidence that she took the medication."[65] The Defense also filed a motion to abate the proceedings due in part to the fact that the Government had not yet turned over Ms. Foxtrot's medical records to them.

During the Article 39(a) session at which the military judge heard argument on these motions, he modified his prior ruling that Ms. Foxtrot's medical records were to be turned over directly to the Defense. Specifically, he ordered the Government turn over these records to the court for in camera review to protect the privacy of Ms. Foxtrot. The military judge further stated that following the in camera review, he would disclose any relevant records to the Defense. Subsequently, when asked by the military judge, TDC indicated that

---

[63] R. at 269.

[64] *Id.*

[65] App. Ex. LXI at 3.

there was no Defense objection to the military judge's intention to conduct an in camera review of the records.

After conducting the in camera review of 349 pages of Ms. Foxtrot's medical records and 28 pages of her PEB records, the military judge provided the parties two redacted pages from her medical records. He also informed the parties that "[t]he rest of the pages from the medical and the PEB records are not responsive to the Defense motion and the non-responsive pages will be attached to the record as [sealed] appellate exhibits."[66]

The two pages from the records provided to the parties included information that Ms. Foxtrot had an active prescription for Fluoxetine (Prozac) on the date of the alleged offenses. The excerpt from the records disclosed to the parties included information with regard to how often she was required to take the Fluoxetine, the size of the prescribed dose, when the prescription was filled, and the number of pills distributed. However, none of the records disclosed by the military judge contained information pertaining to Ms. Foxtrot being on pain medications.

On appeal, Appellant filed a motion with this Court to examine sealed materials in the record of trial, including Ms. Foxtrot's medical and PEB records that had been reviewed in camera and then sealed by the military judge. We denied that motion for lack of good cause shown, but we authorized Appellant to "refile to demonstrate good cause in accordance with R.C.M. 1113(b)(3)."[67] Appellant filed a second motion to examine the sealed medical records and PEB records. However, after conducting a review of these records, we came to essentially the same conclusion as the military judge, that the only potentially relevant information contained therein pertained to Ms. Foxtrot's prescription for Fluoxetine that was active at the time of the charged offenses. We also noted that, although at various times Ms. Foxtrot had prescriptions for pain medication, none of those prescriptions were active on the date of the charged offenses involving her. Therefore, we denied Appellant's renewed motion to examine the sealed materials at issue.

**E. Military Judge Denies Defense Motion to Compel Funding for the Production of the Defense Expert Witness in the Field of Forensic Psychiatry**

During pretrial litigation, Appellant filed a motion to compel expert assistance in the field of forensic psychology. Specifically, he moved the military

---

[66] App. Ex. LVIII at 1.

[67] Order of 1 June 2021.

judge to compel funding to employ Dr. Sierra, a civilian forensic psychologist in private practice, to consult on various matters including the effect of both alcohol and prescription medication on Ms. Foxtrot's ability to perceive and recall the sexual interaction between them. The Defense submitted a written declaration from Dr. Sierra, which provided in pertinent part:

> From the science and literature in this area, we understand that alcohol primarily interferes with the ability to form new long-term memories and the ability to keep new information active in memory for brief periods. As the amount of alcohol consumed increases, so does the degree, and magnitude of the observed and/or experienced memory impairments. Large amounts of alcohol, particularly if consumed rapidly, can produce partial (i.e. fragmentary) or complete (i.e. en bloc) blackouts, which are periods of memory loss for events that transpired while a person was consuming alcohol. The individual's personal history of alcohol use, abuse or dependence and prior memory loss experience, plays a critical role.

> Alcohol can have a dramatic impact on memory. Alcohol primarily disrupts the ability to form new long-term memories; it causes less disruption of recall of previously established long-term memories or of the ability to keep new information active in short-term memory for few seconds or more. At low doses (which would not be relevant in this case), the impairment[s] produced by alcohol are often subtle, though they are detectable in controlled conditions. As the amount of alcohol consumed increases, so does the magnitude of the memory impairments. Large quantities of alcohol (which would be relevant in this case), particularly if consume[d] rapidly, may produce a blackout, an interval of time for which the intoxicated person cannot recall key details of events, or even entire events. Finally, that alcohol if combined with medication, particularly pain medication, could drastically affect an individual's ability to recall details of events.[68]

---

[68] App. Ex. XII at 42.

In her declaration, Dr. Sierra also opined that, in her experience with criminal trials, to include general courts-martial, jurors do not "readily possess sufficient understanding of the science behind human memory to accurately apply their knowledge, in their deliberations."[69]

The Government opposed the Defense motion to compel expert assistance, arguing that Appellant had failed to meet his burden of proving that the requested expert was necessary to present an adequate defense in this case. The military judge agreed and denied Appellant's motion to compel funding for Dr. Sierra to serve as a Defense expert consultant.

The day after the military judge denied the motion, the Government, on its own accord and without being ordered to do so by the military judge, provided the Defense with Dr. Juliet, who was both a U.S. Air Force Captain and a forensic psychiatrist fellow assigned at the Walter Reed National Military Medical Center in Maryland, as an expert consultant. After consulting with Dr. Juliet, the Defense unsuccessfully requested the Convening Authority approve funding for him to travel to Twentynine Palms, California, to consult with the Defense during trial and to ripen into a defense expert witness at trial. Subsequently, the Defense filed a motion to compel funding for Dr. Juliet to travel to testify as a Defense expert witness in the field of forensic psychiatry.[70] The Government opposed the Defense's motion.

Dr. Juliet testified telephonically as a Defense witness on the motion. Specifically, he testified in relevant part as follows:

| DC: | So at issue in this case is the reliability of the victim's memory of the offense. Can you explain to the Court how memory works? |
| --- | --- |
| Dr. Juliet: | So there's a lot of controversy. A lay person typically thinks that memory works a bit like a camera, where you see something and it's stored straight into long-term memory, kept to remember forever, but it's more of a reconstruction memory, subject to many errors and it's very complicated. |

---

[69] *Id.* at 43.

[70] Although the Defense motion identified Dr. Juliet as an expert in the field of forensic psychology, the military judge corrected the Defense team on the record, pointing out that Dr. Juliet was actually a psychiatrist. R. at 637.

…

DC:     And how does alcohol affect memory?

Dr. Juliet:   Alcohol seems mostly to influence the stage of memory formation where – like, going from short-term memory into long-term memory.

DC:     And how does the amount of alcohol consumed affect memory impairments?

Dr. Juliet:   So the amount of alcohol consumed increases the magnitude of the memory impairments. Large quantities of alcohol, particularly consumed very rapidly, can cause the victim to experience either fragmentary or *en bloc* blackout.

DC:     And how reliable is the memory of someone who's been drinking?

Dr. Juliet:   Well, the more a person drinks, the less reliable the memory is.

DC:     Can you explain to the Court what a blackout is?

Dr. Juliet:   Blackouts can be, kind of, broken up into two different types. You got fragmentary blackouts, which is when people can only remember portions of an event, kind of like the memory goes in and out during an episode. And then an *en bloc* blackout is where there's like a discrete point in time where a person just does not remember anything from that point forward.

        And blackouts, in particular, are distinct from passing out in that an outside observer viewing someone who is blackout drunk would not be able to tell if that person is blackout drunk. They'd just see someone who's a little bit intoxicated. But from the perspective of the person who has been drinking, they don't remember

> anything, but they continue to act similar to how they were before.

DC: So you're saying it's not easy for an outside observer to tell when someone's blacked out?

Dr. Juliet: Not at all. So most lay people can tell if someone has been drinking, but people are very unreliable at telling if someone – like, the degree of intoxication.

DC: Can you explain to the Court what a brownout is?

Dr. Juliet: So the brownout is another term for a fragmentary blackout. So it's more transient, forgetful, memory loss. So you'll lose, like certain parts of your night, but not the whole night in question. And, occasionally, you can recall parts of memory from a brownout.

…

DC: So you've read the evidence in [Ms. Foxtrot's] statements. Is it possible, based on what you have read, that she blacked out on the evening in question?

Dr. Juliet: It's possible that she had a fragmentary blackout.[71]

On cross-examination, the Government elicited from Dr. Juliet that it was not known how much alcohol Ms. Foxtrot consumed on the evening in question or the specific timeline with regard to when she consumed the alcohol. The Government also elicited from Dr. Juliet that the likelihood of a person being in a blackout decreases when the level of alcohol in the person's system decreases, and that in this case, a significant amount of time elapsed between when Ms. Foxtrot stopped drinking and when she was able to gain access to her hotel room. Dr. Juliet also agreed that, even if at some point in the evening Ms. Juliet suffered a fragmentary blackout, it would be less likely that she was

---

[71] R. at 424, 426-27,432.

still in that state by the time she went to sleep, due to the period of time that passed while she was trying to get into her room.

During argument on the motion, the Defense emphasized:

> …[Ms. Foxtrot's] ability to perceive events while intoxicated, especially if medicine is in the mix, *but even if is not*, is a critical issue in this case. And as you heard from Dr. [Juliet] … there is much about memory and alcohol's effect on memory that exceeds what is common knowledge to the average person.[72]

The Defense also argued:

> And we need to be able to present our case that, you know, science indicated that … there is a high likelihood that she's experiencing fragmentary blackout or that her memory is, in fact, fallible. So, again, that's the heart of the [Article] 120 charges. And again, we have no other way to present this evidence.[73]

In response to the Government's argument against compelling funding for Dr. Juliet to serve as a Defense expert witness at trial, the Defense offered the following rebuttal in pertinent part,

> I know that the government just pointed out that … we, as Marines, … are exposed to alcohol, but I think it's unfair to make that broad statement. I mean … there are people who don't drink in the Marine Corps; there are – and, as you have heard from Dr. [Juliet], we, in general, have difficulty telling, you know, a person's level of intoxication. He stated, it is easy for us to know when someone is intoxicated, but not easy for us to know their level of intoxication. And these things are things that – is a common misconception to us. We might think that we know someone is blacked out, but they are – that they're not blacked out, but they are, and that is not a common fact.
>
> And, again, people on the panel will have varied experiences with alcohol, and some might not even drink alcohol at all. So I think it's – he could fill in those gaps and explain to all members to make sure that they're on the same page and that they aren't … going off these preconceived notions that are wrong.[74]

---

[72] *Id.* at 448 (emphasis added).

[73] *Id.* at 449-50.

[74] *Id.* at 454-55.

After receiving evidence and argument on the motion, the military judge in an oral ruling on the record, denied the Defense motion to compel funding to facilitate Dr. Juliet's testimony as an expert witness. As part of his analysis, the military judge reasoned that Dr. Juliet's testimony would have "low probative value because [Ms. Foxtrot] has already admitted that she does not remember the incident."[75] The military judge elaborated on this conclusion of law stating:

> Whether [Ms. Foxtrot] was able to remember the accused touching her breasts and vagina is very clearly not in issue because [Ms. Foxtrot] already told NCIS that she does not remember. She also told NCIS in her 22 March 2019 interview that on 18 March 2019, when the accused sent her more sexual messages via the Snapchat app, that she replied to him by saying "I don't know what you want me to say. I don't remember it happening, so I don't understand why it did happen." [Ms. Foxtrot] has admitted that she does not remember.[76]

The military judge also discounted the Defense's argument that Dr. Juliet's testimony was necessary to educate the members about how memory formation works and what intervening factors may interfere with memory formation as these concepts pertained to Appellant's sexual interaction with Ms. Foxtrot. Quoting from his ruling denying the Defense's earlier motion to compel funding to appoint Dr. Sierra as an expert consultant in the field of forensic psychology, the military judge made the following findings of fact and followed up with conclusions of law:

> "It is very well known by adults in the United States that alcohol impairs one's memory. Even if someone has never consumed alcohol, the phenomenon of memory loss after excessive alcohol consumption is well represented in movies, television and social media. Such a phenomenon will not come as a shock to any of the members in this case. All of that will certainly be within the ken of the members to consider and evaluate as they decide the case." The Court adopts that same finding when ruling on the present defense motion.

> Additionally, whether [Ms. Foxtrot] remembers or not, as previously noted, is not in issue, and thus it is not relevant testimony. The issue of whether [Ms. Foxtrot] remembers is well-

---

[75] *Id.* at 644.

[76] *Id.* at 645.

settled in this case. She does not remember, and we know that because she told NCIS that in her 22 March 2019 interview. Thus Dr. [Juliet's] testimony will not help the trier of fact to determine a fact in issue because the fact is settled and is not in issue. [Ms. Foxtrot] does not remember, and if she suddenly does remember while testifying, then the defense is well-equipped to point that out during cross-examination, which does not require expert testimony.

Because [Ms. Foxtrot's] recall of the alleged crimes is not in issue, the probative value of Dr. [Juliet's] testimony is very low and is substantially outweighed by dangers of undue delay, wasting time, and needlessly presenting cumulative evidence.[77]

At trial, the Government's theme and theory of the case echoed Ms. Foxtrot's testimony on the merits, that she did not remember Appellant engaging in sexual activity with her because she had been asleep when it happened. Conversely, the Defense's theme and theory was that Ms. Foxtrot had been awake and consenting during the sexual activity. The Defense further posited that she only said that she had been asleep during the encounter when she returned to "IPAC High," which the Defense described as "something like a high school, where drama, rumors, gossip, and jealousy rule the day, where everybody knows everyone's business, and where nothing is sacred."[78]

## F. Government Evidence Introduced at Trial to Prove Appellant Made a False Official Statement

At trial, the Government presented evidence to prove that Appellant made a false official statement. The specification alleged Appellant made multiple false statements that he was not required to check in for restriction to his unit's officer of the day [OOD] during a period of over a month and a half. Specifically, the Government successfully introduced excerpts from the duty logbook during the relevant period that documented that certain individuals in positions of authority within the unit had purportedly called the OOD to excuse Appellant from his restriction musters. The Government also presented testimony of the chief warrant officer who was the officer in charge [OIC] of Appellant's section at the IPAC, as well as the gunnery sergeant who was Appellant's staff non-commissioned officer in charge [SNCOIC] during the relevant period. Each of these members of Appellant's chain of command were asked to review entries in the duty logbook, which reflected on various occasions each had called the

---

[77] *Id.* at 645-46.

[78] R. at 1452.

OOD to excuse Appellant from restriction muster for such things as volunteer work or church. Each denied that he had ever informed the OOD that Appellant was excused from restriction muster for such events. Moreover, each denied that he even had the authority to excuse Appellant from such musters.

**G. Trial Defense Counsel Declarations in Response to Ineffective Assistance of Counsel Allegation**

On appeal, Appellant asserts that he invoked his right to remain silent on three separate points (indicated in italics below) during the course of the NCIS interrogation:

| | | |
|---|---|---|
| 4:41:35 PM[79] | Appellant: | *I'm not going to say nothing no more.* |
| | SA Mike: | Ok, let me ask you this… |
| | Appellant: | I know what like--what you're trying to do. |
| | SA Mike: | I'm not trying to do anything. |
| … | | |
| 4:46:50 PM | SA Mike: | Listen, Malik. Let me ask you something, I got a question for you. Did you touch [Ms. Foxtrot]---- |
| | Appellant: | Without her consent? No. |
| | SA Mike: | Ok. Would you be willing to take a polygraph? |
| | Appellant: | Yes |
| | SA Mike: | You'll take a polygraph? |
| | Appellant: | Yes. |
| 4:47:02 PM | SA Mike: | Okay. We'll take a break. Okay? And we're gonna come right back. Okay? Give us a minute. Let's take a break. Alright? |
| | Appellant: | Can I call my mom? |

---

[79] All times reflect that which is reflected onscreen in the video recording of the interrogation.

| | | |
|---|---|---|
| | SA Mike: | Well, right now you're appre-hended, okay? So once we let you go and you go back to your unit you can call whoever you want to, okay, but we're not going to bring a phone in here for you to call anybody. |
| | Appellant: | I mean, but so I'm not going to take the polygram [sic]. |
| | SA Mike: | Okay. |
| | Appellant: | *Like nothing else further.* If I can't call my mom because you all are not allowing me to because you want to keep me apprehended then that's fine--that's fine with me, but *I'm not going to do anything else further.* |
| 4:47:35 PM | SA Mike: | Okay. Alright. Sounds good. Let me ask you one more question. You said you text[ed] [Ms.Foxtrot] on your phone. Can we take a look at your phone? |
| | Appellant: | No. |
| | SA Mike: | Okay. Alright. No worries. Sit tight here real quick. Alright? We'll come right back. Alright? You want to talk more about this? Or do you just want to stop talking? Which one is it?[80] |

SA Mike continued asking Appellant more questions. Appellant eventually signed a Permissive Authorization for Search and Seizure for his phone. The NCIS agents then continued to interrogate Appellant, and confronted him with

---

[80] Unredacted Interrogation of Appellant of 25 March 2019 ["Unredacted Interrogation], Art, 32 Government Exhibit 1.g.

his text messages with Ms. Foxtrot that were part of the NCIS controlled conversation. The agents stopped asking Appellant questions when he stated, "I'm done talking."[81]

Although they requested certain redactions of the interrogation, TDC did not move to suppress Appellant's statements to NCIS. After both reviewing Appellant's allegation of ineffective assistance of counsel [IAC], examining the record, we found that the standards established by *United States v. Melson*[82] for the Court-ordered production of affidavits or declarations had been met. Accordingly, we ordered Appellant's three detailed TDC, Captain [Capt] (O-3) Lima, Capt Papa, and First Lieutenant [1stLt] (O-2) Joseph to submit declarations that addressed Appellant's allegation. Upon reviewing these declarations, we found each to be credible.

Each of the three TDC declarations confirmed that they reviewed and considered the potential constitutional and Military Rules of Evidence [Mil. R. Evid.] issues with regard to Appellant's purported invocation of his right to silence. Lead TDC, Capt Lima, said that he was primarily responsible for reviewing Appellant's statement to NCIS, that he did consider the issue of bringing a motion to suppress Appellant's statement, and in doing so consulted with the Defense's Highly Qualified Expert/attorney advisor and the Senior Defense Counsel. Capt Papa and 1stLt Joseph corroborate these assertions.

Next, the TDC declarations assert that the Defense team had a tactical rationale to forgo a motion to suppress Appellant's statements to NCIS. Capt Lima explained that Appellant's statements before and after the purported invocations of his right to silence supported the Defense's theory that his sexual activity with Ms. Foxtrot had been consensual. Capt Lima also articulated that the Defense team wanted the members to see that although Appellant was held by NCIS for over five hours, and subjected to intense questioning during part of that time, he maintained throughout that the sexual activity was consensual. Beyond tactical considerations, Capt Lima asserted that the Defense team did not have a good faith basis to move to suppress the majority of Appellant's statements to NCIS, because they were made prior to the purported invocation.

Moreover, Capt Lima asserted that the introduction of Appellant's statements to NCIS allowed the Defense to put forth before the members Appellant's side of the story, that his sexual encounter with Ms. Foxtrot was consensual, without him being subject to cross examination. As a result, the Defense

---

[81] Unredacted Interrogation at 6:17:49 PM.

[82] 66 M.J. 346, 350–51 (C.A.A.F. 2008).

team advised Appellant not to testify, and he took that advice. Capt Papa's and 1stLt Joseph's declarations directly corroborated all of Capt Lima's assertions on these issues.

## II. DISCUSSION

### A. Continuance Requests and Appellant's Release of Civilian Defense Counsel

#### 1. Standard of review and the law

"A military's judge's decision to grant or deny a continuance must be tested for an abuse of discretion even where failure to grant a continuance would deny an accused the right to a civilian counsel."[83] Military judges abuse their discretion when their reasons for denial are "clearly untenable" and "deprive a party of a substantial right such as to amount to a denial of justice."[84] The Sixth Amendment guarantees that in "all criminal prosecutions, the accused shall enjoy the right … to have the Assistance of Counsel for his defence."[85] The core of this right is the "opportunity for a defendant to consult with an attorney and to have [her] investigate the case and prepare a defense for trial."[86] The Sixth Amendment also guarantees "the right to choice of counsel for those who hire their own counsel."[87] "It commands, not that a trial be fair, but that a particular guarantee of fairness be provided – to wit, that the accused be defended by the counsel he believes to be best."[88] Even if an accused receives adequate representation by counsel, if he or she is erroneously prevented from being represented by the attorney he or she wants, then the right has been violated.[89] Such a violation of the right to counsel is not subject to a harmless error analysis.[90]

---

[83] *Miller*, 47 M.J. at 358.

[84] *Id.*

[85] U.S. Const. amend. VI.

[86] *Kansas v. Ventris*, 556 U.S. 586, 590 (2009) (citation and internal quotation omitted).

[87] *United States v. Watkins,* 80 M.J. 253, 258 (C.A.A.F. 2020) (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)).

[88] *Id.* (quoting *Gonzalez-Lopez*, 548 U.S. at 146).

[89] *Id.* (citing *Gonzalez-Lopez*, 548 U.S. at 148).

[90] *Id.* (citing *Gonzalez-Lopez*, 548 U.S. at 150).

Article 40, UCMJ, authorizes a military judge to grant a continuance "for as long and as often as is just."[91] A continuance may be granted to allow counsel the opportunity to prepare for trial.[92] While the right to civilian counsel is not absolute, "an unreasoning and arbitrary instance upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel."[93] In those instances where a continuance request implicates the accused's Sixth Amendment right to counsel, the "controlling factor is whether the [accused] was accorded the opportunity to secure counsel of his choice."[94]

To determine whether a military judge abused his or her discretion in denying a continuance request, we consider the following factors promulgated by CAAF in *United States v. Miller*:

> surprise, nature of any evidence involved, timeliness of the request, substitute testimony or evidence, availability of witness or evidence requested, length of continuance, prejudice to opponent, moving party received prior continuances, good faith of moving party, use of reasonable diligence by moving party, possible impact on verdict, and prior notice.[95]

Appellate courts need not decide if a military judge abuses his or her discretion denying a continuance where an appellant fails to establish prejudice.[96]

Waiver is the intentional relinquishment or abandonment of a known right.[97] Generally, waiver of fundamental rights must be "knowing, intelligent, and voluntary."[98] "An understanding of the alternatives is a necessary component of an informed waiver."[99]

---

[91] *United States v. Parker*, 75 M.J. 603, 613 (N-M Ct. Crim. App. 2016) (quoting R.C.M. 906(b)(1) Discussion).

[92] R.C.M. 906(b)(1) Discussion.

[93] *Miller*, 47 M.J. at 358.

[94] *Id.* (internal citation omitted).

[95] *Id.* (internal citation omitted).

[96] *United States v. Wellington*, 58 M.J. 420, 425 (C.A.A.F. 2003).

[97] *United States. v. Edwards*, ___ M.J. ___, No. 21-0245, 2022 CAAF LEXIS 283 at *13 (C.A.A.F. April 14, 2022).

[98] *United States v. Cooper*, 78 M.J. 283, 288 (C.A.A.F. 2019).

[99] *United States v. Andrews*, 21 U.S.C.M.A. 165, 168 (C.M.A. 1972).

*2. Appellant's voluntary release of CDC waived his claim of error*

In light of this precedent and after considering the facts of the present case, we hold that Appellant affirmatively waived any claim arising from the military judge's denial of the continuance motions. In our review of the record, we find that Appellant, after receiving a thorough explanation about both his rights and the effect of his decision on any appeal of his case should he be convicted, knowingly and voluntarily waived the counsel of choice issue and thus also waived the related issues arising from the continuance requests. Appellant urges this Court to examine the underlying denials of the continuance requests, but that is unnecessary. Because the only prejudice he asserts is the purported denial of his counsel of choice, we merely need to scrutinize that issue to decide whether the military judges abused their discretion in denying Appellant's various continuance motions.[100]

Doing so, we determine that by voluntarily releasing his CDC, Appellant waived any argument that he was denied his counsel of choice. This, in turn, rendered moot the denials of his continuance requests. After Appellant made an initial conditional release of his CDC, which the military judge found to be involuntary, Appellant submitted a second request to release his CDC. The military judge then undertook a detailed colloquy with Appellant. The military judge explained, thoroughly and clearly, to Appellant the reason that his involuntary release of CDC was denied, that he was not required in any way to release his CDC, and that he found Appellant's CDC could still be useful to him despite being less prepared than Appellant would have preferred. The Appellant then stated, despite understanding the alternatives available to him, that he still desired to release his CDC from representing him. In particular, the military judge provided a clear explanation of the consequences of his voluntary release of his CDC:

> If she's taken off the case by you, you're the driving force behind that, the voluntary decision is that you want her released, then her level of preparation is irrelevant because you've decided that you don't want her on the case for a voluntary reason, okay? And if her level of preparation is irrelevant because you voluntarily decided to take her off the case, you would be choosing to do that, nothing else will be forcing that, and then that would be the end of it. She just wouldn't be counsel because of your choice, and

---

[100] *See Wellington*, 58 M.J. at 425 (where CAAF declined to decide the issue of whether the military judge abused his discretion because Appellant had not established prejudice).

then any issue with respect to her being able to be prepared
would be gone, okay?[101]

Appellant stated that he understood what the military judge had explained to
him and that he understood that "voluntary release of [his CDC] will likely
make [his] continuance motion unreviewable on appeal."[102] We find Appellant's
release of his CDC to be clear waiver of his right to counsel issue, which conse-
quentially defeats his argument that he suffered prejudice due to the denial of
his continuance requests.[103]

## B. Members Selection Process

### 1. Standard of review and the law

We review claims of error in the selection of court-martial members de
novo.[104] In doing so, we are bound by the military judge's findings of fact unless
they are clearly erroneous.[105] "As a matter of due process, an accused has a
constitutional right, as well as a regulatory right, to a fair and impartial
panel."[106] These rights are effectuated pre-trial though the strictures of Article
25, UCMJ, and at trial though use of peremptory and causal challenges.[107] Ar-
ticle 25, UCMJ, generally provides that any active duty officer, as well as any
active duty enlisted servicemember, is eligible to serve on a court-martial for
the trial of an enlisted servicemember.[108] Article 25(e) narrows that provision

---

[101] R. at 910.

[102] R. at 918.

[103] While our decision in this case is based on waiver, we note that Appellant ad-
mitted to the military judge on the record that at the time he retained his CDC, a mere
18 days before trial, he knew that there was no guarantee that she would have enough
time to adequately prepare for trial. R. at 920. Appellant hired his CDC assuming that
there would be a continuance – which was granted, although not for the length of time
that he and CDC had wished. In addition, Appellant availed himself of the benefit of
three military defense counsel, who zealously represented his interests through mul-
tiple rounds of motions litigation. At no time did he attempt to dismiss his military
defense counsel, nor express that he did not wish to be represented by them.

[104] *United States v. Bartlett*, 66 M.J. 426, 427. (C.A.A.F. 2008).

[105] *United States v. Benedict*, 55 M.J. 451, 454 (C.A.A.F. 2001).

[106] *United States v. Downing,* 56 M.J. 419, 421 (C.A.A.F. 2002) (internal quotation
omitted).

[107] *United States v. Gooch*,  69 M.J. 353, 357 (C.A.A.F. 2011).

[108] Article 25(a)-(c), UCMJ.

and states that members junior in rank or grade to the accused are ineligible to serve when it can be avoided.[109]

A convening authority typically has broad discretion when selecting panel members, so long as the selection criteria are based on the factors outlined in Article 25.[110] Although it is required for convening authorities to personally select the members of courts-martial, they may rely on the assistance of staff and subordinates to compile a list of eligible members.[111]

There is an absolute prohibition on assigning, or excluding, members from a court-martial in order to achieve a particular result as to findings or sentence.[112] Such panel-stacking constitutes unlawful command influence and "has the improper motive of seeking to affect the findings or sentence by including or excluding classes of individuals on bases other than those prescribed by statute."[113] However, not all instances of improper member selection constitute panel-stacking.[114] "Once the issue of improper member selection has been raised … the burden shifts to the government to demonstrate beyond a reasonable doubt that improper selection methods were not used, or, that the motive behind the use of the selection criteria was benign."[115] The government may do so by demonstrating simple administrative error or by showing that any inclusion or exclusion was the result of the convening authority's attempt to comply with Article 25, UCMJ.[116]

CAAF has developed a non-exhaustive list of factors to use as a starting point in evaluating the propriety of any member selection process:

> First, we will not tolerate an improper motive to pack the member pool. Second, systemic exclusion of otherwise qualified potential members based on an impermissible variable such as rank is improper. Third, this Court will be deferential to good faith attempts to be inclusive and to require representativeness

---

[109] Article 25(e)(1), UCMJ.

[110] *United States v. Riesbeck*, 77 M.J. 154, 163 (C.A.A.F. 2018).

[111] *United States v. Dowty*, 60 M.J. 163, 169-70 (C.A.A.F. 2004).

[112] *Riesbeck*, 77 M.J. at 165.

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] *Id.*

so that court-martial service is open to all segments of the military community.[117]

*2. The member selection process was benign and did not violate Appellant's Constitutional right to a fair and impartial panel*

At the outset, we find no evidence in the record to support a determination that an improper motive existed on the part of the Government to pack the member pool. The DSJA, in his review of the member questionnaires collected by the HQBN, identified there were no E-4s or E-5s on the list of potential members. Seeking to comply with the requirements of Article 25, he requested that the HQBN solicit member questionnaires from noncommissioned officers, specifically corporals, so that they could be included in the list forwarded to the Convening Authority for consideration.[118] When the list of potential members was forwarded to the Convening Authority, it was accompanied by an Article 25 advice memorandum from the SJA. The memorandum stated, in part:

> 2. While a Convening Authority retains wide latitude under Article 25, a convening authority may not systematically exclude personnel from panel selection based on rank.
>
> …
>
> 4. While not specifically required under Article 25, every effort should be made to give the Accused an opportunity to sit before a panel of his peers, including peers of the same rank, where appropriate. Failure to provide such an opportunity to Corporal

---

[117] *Dowty*, 60 M.J. at 171 (internal citations omitted).

[118] We concur with the observation of the military judge that there was no reason for the SJA's office to structure their member-selection process around previously-collected members' questionnaires. There is nothing impermissible about the HQBN collecting such questionnaires from E-7 and above new check-ins to the unit. However, had it not been for the diligence exercised by the DSJA, the SJA's office may have blindly relied upon those questionnaires as it compiled a list of potential members for consideration. Consequentially, the Convening Authority may have found himself perilously close to systematically excluding members from consideration based on rank. *See United States v. Bartee*, 76 M.J. 141, 144 (C.A.A.F. 2017) (finding no improper selection, despite the categorical exclusion of members by rank on potential member list, where the convening authority was provided an alpha roster of the command and advised that he could choose court-martial members from among the full roster if he wished to do so).

Bunton will likely lead to significant appellate issues, should a conviction result.[119]

We are satisfied beyond a reasonable doubt that the motives behind the member selection criteria used in this case were benign and indicative of an effort to be inclusive and to require representativeness. We also are satisfied that the Convening Authority was properly advised of his obligations under Article 25, UCMJ. We further find beyond a reasonable doubt that there was no systematic exclusion of members based on impermissible criteria. Thus, we find Appellant's due process right to a fair and impartial panel was not violated.

*3. Despite administrative error in the member selection process, Appellant was not prejudiced*

However, despite the SJA office's good faith attempt to ensure inclusivity of NCOs in the list of potential members provided to the Convening Authority for his consideration, we do find that there was administrative error in the members selection process.

Appellant argues that, had the two Corporals in the instant case made it onto the panel, they would have been subject to challenge for cause by the Government because they were junior by date of rank to him. While this hypothetical scenario never came to pass, Appellant's supposition does underscore an error made during the member selection process. There is no evidence in the record to conclude that Appellant's date of rank relative to the two Corporals' dates of rank was ever discussed by those involved in the members selection process, or to conclude that calculations about those differentials in dates of rank played any role in the member selection process for Appellant's court-martial. However, "[s]creening potential members of junior rank or grade is not only proper; *it is required* by Article 25(d)(1), UCMJ."[120] Congress, in prescribing Article 25, UCMJ, was specific in setting out "detailed requirements, disqualifications, and prohibitions" for courts-martial.[121] In order to ensure an accused is not tried by members junior to him or her, it is indeed necessary for there to be, and incumbent upon the government to conduct, a review of the date-of-rank of potential members that share the same rank or grade as the

---

[119] App. Ex. CI at 3 (citations omitted).

[120] *Gooch*, 69 M.J. at 358 (emphasis added). Article 25(d)(1), UCMJ, was subsequently restyled as Article 25(e)(1), UCMJ.

[121] *Bartlett*, 66 M.J. at 429.

accused.[122] It is inescapable, then, that the SJA office's failure to do so in this case constituted error.

Where, as here, we find nonconstitutional error in the application of Article 25, UCMJ, we must determine whether the error materially prejudiced the substantial rights of the accused.[123] For use in such analysis, CAAF has identified three categories of nonconstitutional error and their corresponding burdens:

> First, in the case of administrative mistake, the appellant must demonstrate prejudice. Second, where the government has intentionally included or excluded a class of eligible members, the government must demonstrate lack of harm. Third, in the case of unlawful command influence, the government must prove beyond a reasonable doubt that the error was harmless.[124]

We recognize that the line between each category can, in some cases, be blurry, but here it is clear.[125] As Appellant points out, the failure of the SJA's office to account for the relevant dates of rank may have subjected the two Corporals, whose names had been submitted to the Convening Authority as potential members, to challenge for cause and create a kind of de facto exclusion of NCOs from his members panel. However, there is no evidence that the Convening Authority, the SJA and his office, or the HQBN intended to do so. Rather, the record demonstrates that the DSJA made a specific effort to provide a more inclusive list of potential members to the Convening Authority, and that the SJA advised the Convening Authority of the mandates of Article 25, UCMJ, to include specific, written advice that a convening authority may not systematically exclude personnel from panel selection based on rank. The failure to screen the dates of rank of the two Corporals whose names were forwarded to the Convening Authority as potential members was a ministerial mistake indicative of administrative error.[126] Thus, the burden rests with Appellant to demonstrate prejudice.

---

[122] *Gooch*, 69 M.J. at 358.

[123] *Id*. at 360.

[124] *Id*. at 361. (internal citations omitted).

[125] *Id*.

[126] *See id*. (holding that exclusion of a class of members based on dates of service at Sheppard Air Force Base was "more than a ministerial mistake, such as the omission of an Article 25, UCMJ, factor, or an intended name in a memorandum.").

We conclude that the Appellant has failed to meet this burden. The error in this case did not prejudice Appellant for two reasons. First, the two potential members junior in rank to Appellant were not ultimately selected by the Convening Authority. The SJA properly advised the Convening Authority against systematic exclusion based on rank and emphasized the importance of giving Appellant the opportunity to sit before a panel of his peers. Second, the panel by which Appellant was ultimately tried complied with the criteria set out in Article 25, UCMJ, and was fair and impartial. The military judge oversaw a thorough group and individual voir dire process, in which he properly applied the law, including consideration of actual and implied bias.[127] Six of Appellant's eight challenges based on implied bias were granted.[128] Thus, Appellant's claim lacks merit.

## C. Excerpted Medical Records Provided to Defense Following In Camera Review by Military Judge

### 1. Standard of review and the law

We review a military judge's decision on a request for discovery for abuse of discretion.[129] Military judges abuse their discretion when their findings of fact are clearly erroneous, when they are incorrect about the applicable law, or when they improperly apply the law.[130]

Article 46, UCMJ, provides the trial counsel, defense counsel, and the court-martial with the "equal opportunity to obtain witnesses and other evidence in accordance with" the rules prescribed by the President.[131] This statute is implemented by Rule for Courts-Martial [R.C.M.] 701, which sets forth the rights and obligations of the parties.[132] Among the Government's obligations is to disclose documents within the possession, custody, or control of military au-

---

[127] *See id.*

[128] Furthermore, one of the two members whom Appellant unsuccessfully challenged for cause was later excused based on his peremptory challenge.

[129] *United States v. Stellato*, 74 M.J. 473, 480 (C.A.A.F. 2015); *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004).

[130] *Roberts*, 59 M.J. at 326.

[131] Art. 46, UCMJ, 10 U.S.C. § 846.

[132] *Roberts*, 59 M.J. at 326.

thorities upon request of the defense when the item is "relevant to the preparation of the defense."[133] Similarly, the Government is required to permit the defense to inspect the results or reports of physical or mental examination within the possession, custody, or control of military authorities, upon request when the item is "relevant to the preparation of the defense."[134] Subject to limitations in the Military Rules of Evidence, R.C.M. 701 also permits the military judge to review any materials in camera, if required by any rule or upon motion by a party.

*2. The military judge did not abuse his discretion with regard to the limited information he disclosed to Appellant from Ms. Foxtrot's medical and PEB records*

Appellant argues that the military judge erred following his in camera review of Ms. Foxtrot's medical and PEB records by not disclosing evidence of prescription narcotics that could have impaired Ms. Foxtrot's memory or impacted her ability to perceive events at the time of the alleged misconduct. We disagree. After conducting our own review of the records at issue we find that, beyond the records disclosed to the parties by the military judge showing that Ms. Foxtrot had an active prescription for Fluoxetine (Prozac) at the time of the charged misconduct, none of the records he reviewed in camera were relevant to the preparation of the defense. In reaching this determination we note the records indicate that, although at various times Ms. Foxtrot had prescriptions for pain medication, none of those prescriptions were active on the date of the charged offenses involving her. Therefore, we conclude that the military judge did not abuse his discretion in limiting the disclosure of Ms. Foxtrot's records.

**D. Appellate Defense Counsel's Access to Sealed Materials**

*1. Standard of review and the law*

Upon motion by a party or on its own motion, this Court may reconsider an interlocutory order previously rendered by it, provided that jurisdiction of the

---

[133] R.C.M. 701(a)(2)(A).

[134] R.C.M. 701(a)(2)(B).

case has not been obtained by CAAF.[135] Jurisdiction vests with CAAF when a petition or certificate has been filed with that court.[136]

If a military judge reviews any materials in camera, the entirety of any materials examined shall be attached to the record of trial as an appellate exhibit.[137] The military judge shall seal any materials examined in camera and not disclosed and may seal other materials as appropriate.[138] Such material may only be examined by reviewing or appellate authorities in accordance with R.C.M. 1113.[139] In turn, that rule provides, "[m]aterials reviewed in camera by a military judge, not released to trial counsel and defense counsel, and sealed may be examined by reviewing authorities. After examination of said materials, the reviewing or appellate authority may permit examination by appellate counsel for good cause."[140]

*2. Appellant has failed to demonstrate good cause on appeal to review Ms. Foxtrot's sealed medical and PEB records in the record of trial*

As discussed above, we have conducted a review of Ms. Foxtrot's medical and PEB records that are sealed and contained in the record of trial. Based on that review, we have determined that the military judge was correct in limiting the disclosure of those records only to information concerning Ms. Foxtrot's active prescription for Fluoxetine. That disclosure included how often she was required to take the Fluoxetine, the size of the prescribed dose, when the prescription was filled and the number of pills distributed. Moreover, the sealed records indicate that, although at various times Ms. Foxtrot had prescriptions for pain medication, none of those prescriptions were active on the date of the charged offenses involving her. Therefore, we conclude that Appellant has not shown good cause for his appellate counsel to examine the sealed materials at issue.[141]

---

[135] N-M. Ct. Crim. App. R. 31.1.

[136] Art. 67, UCMJ; C.A.A.F. R. 5.

[137] R.C.M. 701(g)(2).

[138] *Id.*

[139] *Id.*

[140] R.C.M. 1113(b)(3)(B)(ii).

[141] *See id.*

**E. Military Judge's Denial of Defense Motion to Compel Production of Defense Expert Consultant as an Expert Witness at Trial**

*1. Standard of review and the law*

We review a military judge's ruling on a request for expert assistance for abuse of discretion.[142] "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law."[143] Factual findings are clearly erroneous when they are wholly unsupported by the record.[144]

"Each party is entitled to the production of any witness whose testimony on a matter in issue on the merits … would be relevant and necessary."[145] This equal right to obtain witnesses includes the "equal opportunity to obtain expert witnesses."[146]

To justify production, an appellant must establish: (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence, and; (6) whether the probative value of the testimony outweighs other considerations.[147] The decision on a request for a witness should only be reversed if, "on the whole," denial of the defense witness was improper.[148] An appellate court "should not set aside a judicial action 'unless it has a definite and firm conviction that the court below committed clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.'"[149]

"A finding or sentence of a court-martial may not be held incorrect on the ground of an error unless the error materially prejudices the substantial right of the accused."[150]

---

[142] *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010).

[143] *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008) (cleaned up).

[144] *United States v. Gore*, 60 M.J. 178, 185 (C.A.A.F. 2004).

[145] R.C.M. 703(b)(1).

[146] Mil. R. Evid. 706(a).

[147] *United States v. Ruth*, 46 M.J. 1, 4 (C.A.A.F. 1997) (citing *United States v. Houser*, 36 M.J. 392, 398-99 (C.M.A. 1993)).

[148] *Id.* at 3.

[149] *Id.* (quoting *Hauser*, 36 M.J. at 397).

[150] Article 59(a), UCMJ.

Where a military judge deprives an appellant of expert testimony and consequently deprives him or her of the right to present a defense, the error is constitutional and the test for prejudice on appellate review is whether the appellate court is able to declare a belief that it was harmless beyond a reasonable doubt.[151] "The inquiry for determining whether constitutional error is harmless beyond a reasonable doubt is whether the government can convince the Court that "there was no reasonable possibility that the error might have contributed to the verdict."[152] "To say that an error did not 'contribute' to the verdict is … to find that error unimportant to everything else the [members] considered on the issue in question, as revealed in the record."[153]

If the military judge's error was not of constitutional dimension, the appropriate standard is whether the court-martial's findings of guilt were substantially influenced by the error.[154] In such cases, we apply a four-part test to evaluate prejudice under this standard: "(1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of the evidence in question."[155]

*2. The military judge erred when he denied Appellant's motion to compel Dr. Juliet's production to testify as a Defense expert in forensic psychiatry*

In his motion to compel funding to employ Dr. Juliet as a defense expert witness, Appellant argued that Dr. Juliet's testimony was relevant and necessary. He emphasized that, ultimately, his case came down to whether the allegations of the alleged victim were accurate, truthful, and credible. Although the Defense focused its argument on its contention that Dr. Juliet was necessary to educate the members on the likely impact of the confluence of *both* alcohol and prescription medication upon Ms. Foxtrot's ability to accurately perceive and recall the events at issue, the Defense also emphasized that her consumption of alcohol *alone* could have negatively affected her ability to remember the charged sexual activity. Indeed, Dr. Juliet testified on the motion that it was possible that Ms. Foxtrot had experienced a fragmentary blackout on the night in question. If such testimony had been offered at trial, it would have

---

[151] *United States v. McAllister*, 64 M.J. 248, 251 (C.A.A.F. 2007).

[152] *United States v. Tovarchavez*, 78 M.J. 458, 460 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[153] *United States v. Hills*, 75 M.J. 350, 357 (C.A.A.F. 2016) (cleaned up).

[154] *McAllister*, 64 M.J. at 250. *See also United States v. Kohlbek*, 78 M.J. 326, 334 (C.A.A.F. 2019).

[155] *Id*. (cleaned up).

directly supported the Defense's theory that Ms. Foxtrot consented to Appellant engaging in sexual activity with her, but did not remember doing so.

We find that a finding of fact key to the military judge's denial of the Defense motion to compel the production of Dr. Juliet as an expert witness was clearly erroneous. Specifically, the military judge found:

> It is very well known by adults in the United States that alcohol impairs one's memory. Even if someone has never consumed alcohol, the phenomenon of memory loss after excessive alcohol consumption is well represented in movies, television and social media. Such a phenomenon will not come as a shock to any of the members in this case. All of that will certainly be within the ken of the members to consider and evaluate as they decide the case.[156]

While we take no issue with a finding that most adults in the United States have a general understanding that alcohol can impair one's memory, we sharply disagree with the military judge's additional finding of fact that it could be assumed the members who would sit in judgment of Appellant would, based on either their personal drinking experience or what they had seen in movies, on television, or on social media, have sufficient knowledge in a case such as this, where the complex phenomenon of an alcohol-induced blackout was it issue, to properly evaluate the ultimate issue. Indeed, the military judge's finding of fact that the members would possess sufficient lay knowledge so as to render expert testimony unnecessary was made in the face of a directly contrary—and unrebutted—assertion by Dr. Sierra, who said in her declaration:

> In my experience of criminal trials and general courts[-]martial trials, jury members do not readily possess sufficient understanding of the science behind human memory to accurately apply their knowledge, in their deliberations. The science is not commonly known or understood correctly. The assumptions and myths which many people adopt, about memory, often appear to come from their own personal experience, which is not the same as the empirical findings of valid and reliable science and research. As a consequence of relying upon their limited knowledge and experience in the science of memory, it is entirely likely that the members would apply improper "lay persons'["]

---

[156] R. at 645-46.

understanding during their deliberations. The members' conclusions would very likely be incorrect as a result of this faulty and/or inadequate understanding. This would appear to be prejudicial to the rights of the accused, who would likely wish to know that the members are not relying solely upon their personal experiences during deliberations, but rather, upon objective science which affords them education in areas they may not currently hold. I would be able to educate the members about this science through expert testimony.[157]

Additionally, in his testimony on the motion, Dr. Juliet alluded to the inadequacy of reliance on lay understanding of memory issues when he stated:

A lay person typically thinks that memory works a bit like a camera, where you see something and it's stored straight into long-term memory, kept to remember forever, but it's more of a reconstruction memory, subject to many errors and it's very complicated.[158]

In the face of this evidence that undermined the military judge's finding of fact that members would have a sufficient basis of knowledge in this case to resolve issues concerning the effect of alcohol on memory (and particularly the concept of blackouts) based on personal experience or what they read in the news or watch for entertainment, there is no evidence in the record to support his finding of fact. We add our observation that even if a member generally has experience drinking alcohol, that by no means guarantees that he or she has experience with blackouts, either *en bloc* or fragmentary. For all of these reasons, we find the military judge's finding of fact on this issue was clearly erroneous.[159]

Moreover, we find that the military judge abused his discretion with regard to his conclusion of law that Dr. Juliet's testimony was of "low probative value because [Ms. Foxtrot] has already admitted that she does not remember the incident."[160] Similarly, we find the military judge abused his discretion with his conclusion of law, "[b]ecause [Ms. Foxtrot's] recall of the alleged crimes is not in issue, the probative value of [Dr. Juliet] is very low and is substantially

---

[157] App. Ex. XII at 42-43.

[158] R. at 424.

[159] *See Gore*, 60 M.J. at 185.

[160] R. at 644.

outweighed by dangers of undue delay, wasting time, and needlessly present-ing cumulative evidence."[161] To us, it leaps off the page that there is a signifi-cant difference between a person not remembering an event because she was asleep and her not remembering the event because she was awake but not forming long-term memories because she was suffering from the effects of a blackout. In committing this logical error, the military judge disregarded the Defense's clearly expressed theory that Ms. Foxtrot may have simply forgot being awake (or was unable to access such a memory) and consenting to the charged sexual activity due to a blackout. In doing so, he denied Appellant's opportunity to fully develop and present that theory to the finder of fact at trial.

3. *The military judge's error was not harmless beyond a reasonable doubt because it denied Appellant the opportunity to present a meaningful defense*

We agree with Appellant that the correct standard for assessing prejudice for the improper denial of Dr. Juliet as an expert witness is harmlessness be-yond a reasonable doubt.[162] We make this determination because he was de-nied the right to present the defense that Ms. Foxtrot was awake and con-sented to the charged sexual activity but could not remember due to the fact that she was suffering from a fragmentary blackout during the incident. To be sure, TDC made an effort in closing argument to raise the possibility that she had been awake and consented but could not remember doing so due to alcohol and Prozac in her system,[163] but without Dr. Juliet's testimony that Ms. Fox-trot may have been experiencing a fragmentary blackout, it was an anemic effort at best.

Had the military judge ordered the convening authority to fund Dr. Juliet to travel to the court-martial and permitted him to testify as a defense expert in the field of forensic psychiatry, Appellant could have presented a complete defense that Ms. Foxtrot had been awake and consented to the sexual activity but could not remember due to her consumption of alcohol resulting in a black-out.[164] Thus, we cannot conclude beyond a reasonable doubt that the military

---

[161] *Id*. at 646.

[162] Appellant's Br. at 39-40.

[163] R. at 2072-73.

[164] We intentionally omit discussion about the possibility that the presence of Pro-zac in Ms. Foxtrot's system interacting with the alcohol she consumed could have am-plified the effect of the alcohol she consumed vis-à-vis potential memory loss because

judge's error in denying the production of Dr. Juliet as a Defense expert witness did not contribute to Appellant's conviction. As such, his convictions for sexual assault and abusive sexual contact against Ms. Foxtrot must be set aside.[165]

*4. Assuming that the correct test to assess the prejudice caused by the military judge's denial of Dr. Juliet's testimony under these circumstances is whether the error materially prejudiced Appellant's substantial rights, it would still be necessary to reverse his convictions involving Ms. Foxtrot*

In contrast to Appellant's argument, the Government argues that if we find the military judge committed error by denying the expert testimony of Dr. Juliet, we should not apply the harmless beyond a reasonable doubt standard. Rather, the Government argues that the correct standard is for us to assess whether the error materially prejudiced Appellant's substantial rights. Although we disagree that this is the correct test to assess for prejudice under the circumstances, even if we did apply this test the outcome would be the same.

Here, the case against Appellant was not as strong as the Government would have us find. Although Appellant repeatedly admitted to engaging in the charged sexual activity with Ms. Foxtrot, he also repeatedly asserted that she was both awake and consented to the activity. The Government argues that during the controlled text message conversation Appellant admitted that Ms. Foxtrot had been asleep. However, our review of that text exchange including its context leads us to believe that a reasonable finder of fact could conclude that Appellant was being sarcastic when he texted "I knew you were sleeping."[166] Indeed, immediately after sending that text, he confronted Ms. Foxtrot and claimed that she "said [he] could" engage in sexual activity with her.[167] He then explained that he asked her if she had remembered the sexual activity after it happened because he "was gonna see if [they] could do something else…"[168]

The Defense case had some strength. It was uncontested that Ms. Foxtrot had consumed alcohol to the point of intoxication prior to the incident. We acknowledge about three hours elapsed from her last drink until Appellant

---

there is insufficient evidence in the record concerning the effects of combining this specific medication with alcohol upon human memory.

[165] *See Hills*, 75 M.J. at 357.

[166] Pros. Ex. 1 at 17.

[167] *Id.*

[168] *Id.*

climbed into bed and engaged in sexual activity with her back in their room, and it was unknown exactly how much she had drunk that evening. However, had the Defense decided to make the possibility that Ms. Foxtrot had been suffering from a blackout the primary theme of their case, there would still have been a good faith basis to argue that a significant amount of alcohol may have remained in Ms. Foxtrot's system at the time of the charged sexual activity.

The evidence in question, Dr. Juliet's testimony about the phenomena of blackouts as well as his expert opinion that Ms. Foxtrot may have been experiencing a fragmentary blackout on the evening in question, was material. Had he been produced, Dr. Juliet's testimony could have led a reasonable finder of fact to conclude Ms. Foxtrot consented to the charged sexual activity but could not remember due to having been blacked out, and that she was incorrectly attributing her lack of memory to having been asleep at the time of the incident (or, simply, that the Government had failed to prove the contrary beyond a reasonable doubt). Without this evidence available to it, we infer the Defense felt it necessary to adopt a weaker theme and theory of the case, that Ms. Foxtrot was awake and consented to the charged sexual activity but only chose to claim she was sexually assaulted after she returned to "IPAC High," which the Defense described as "something like a high school."[169]

The quality of the evidence was sufficient to potentially sway a reasonable member in favor of the Defense's theory. We are convinced that Dr. Juliet's testimony about blackouts in general would have been noncontroversial, as shown by the supporting declaration of Dr. Sierra, an independent expert. Dr. Juliet's opinion that Ms. Foxtrot may have been experiencing a fragmentary blackout was subject to cross-examination that emphasized the fact that about three hours had passed from the time of Ms. Foxtrot's last drink to when she gained access to her room and went to bed, thereby decreasing the likelihood that she was in a blackout state at the time of the charged sexual activity. However, due to the fact that she drank to the point of intoxication but did not know exactly how much alcohol she consumed, the Defense theory that she still had a substantial amount of alcohol in her system and was experiencing a blackout during the charged sexual assault was at least plausible.

For these reasons, even if we were to apply the material prejudice to Appellant's rights test to review the military judge's error in denying the motion to compel the production of Dr. Juliet as a Defense expert witness, we would

---

[169] R. at 1452.

still conclude that it is necessary for us to set aside his convictions for committing sexual assault and abusive sexual contact against Ms. Foxtrot.[170]

## F. Allegation that Trial Defense Counsel were Ineffective for Failing to Move to Suppress Appellant's Statements to NCIS

*1. Standard of review and the law*

We review claims of ineffective assistance of counsel de novo.

A military suspect subject to custodial interrogation must be advised of his or her right to remain silent, right to counsel, and the consequences of waiving these rights.[171] When a suspect unambiguously invokes his right to silence, law enforcement must "scrupulously honor[]" this right and immediately cease questioning.[172] Statements taken in violation of these rules are "involuntary."[173] If the defense makes a timely motion or objection, an involuntary statement is inadmissible at trial.[174]

In *Strickland v. Washington*,[175] the Supreme Court laid out the test that guides our analysis. In order to prevail on such a claim, "an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice."[176] The Appellant bears the "burden of establishing the truth of factual matters relevant to the claim."[177] To establish the element of deficiency, the appellant must first overcome "a strong presump-

---

[170] *See McAllister*, 64 M.J. at 250.

[171] Mil. R. Evid. 305(c) and (d).

[172] *Michigan v. Mosely*, 423 U.S. 96, 104 (1975); Mil. R. Evid. 305(c)(4).

[173] Mil. R. Evid. 304(a).

[174] *Id.*

[175] 466 U.S. 668 (1984).

[176] *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F. 2010) (citing *Strickland*, 466 U.S. at 687).

[177] *Denedo v. United States*, 66 M.J. 114, 128 (C.A.A.F. 2008), *aff'd*, 556 U.S. 904, (2009).

tion that counsel's conduct falls within the wide range of reasonable professional assistance."[178] A military appellate court "will not second-guess the strategic or tactical decisions made at trial by defense counsel."[179] If an appellant raises the issue of ineffective assistance of counsel based upon a challenge against the trial strategy or tactics of the defense counsel, "the appellant must show specific defects in counsel's performance that were 'unreasonable under prevailing professional norms.'"[180] Only after an appellant has met his burden and has demonstrated both deficiency and prejudice can we find in the appellant's favor on an ineffective assistance of counsel claim.[181] Strategic decisions to accept or forgo a potential benefit are not deficient when the decisions are objectively reasonable.[182]

*2. Appellant fails to show that the performance of his TDC was deficient*

Assuming without deciding that Appellant made unambiguous invocations of his right to silence that were ignored by NCIS while they interrogated him, we conclude that his TDC were not ineffective despite the fact that they did not move to suppress the remainder of his statements. In their declarations on the issue, each of the three TDC make clear that after carefully considering the issue and discussing it with supervisory counsel, they ultimately made the decision to not seek suppression of the remainder of Appellant's statement based on a tactical consideration. Specifically, they believed that Appellant's statements to NCIS, both before and after the purported invocations, supported their theory of the case, that Ms. Foxtrot consented to the charged sexual activity. Moreover, TDC viewed the admission of Appellant's statements as beneficial because they furthered the Defense theory of the case without subjecting him to cross-examination. In the face of these credible assertions by the TDC, Appellant has not overcome the presumption that it was a reasonable tactical decision under the circumstances of this case for TDC to not seek suppression of his statements to NCIS. For these reasons, Appellant has failed to

---

[178] *United States v. Scott*, 81 M.J. 79, 84 (C.A.A.F. 2021) (quoting *Strickland*, 466 U.S. at 489).

[179] *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F. 2001) (quoting *United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993)).

[180] *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Perez*, 64 M.J. 239, 243 (C.A.A.F. 2006)) (cleaned up).

[181] *United States v. Cooper*, 80 M.J. 664, 672 (N-M. Ct. Crim. App. 2020).

[182] *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012).

establish that his TDCs' decision at issue was unreasonable under prevailing professional norms, and in turn, that their performance was deficient.[183]

**G. Factual Sufficiency of Appellant's False Official Statement Conviction**

*1. Standard of review and the law*

We review each case de novo for factual sufficiency.[184]

In evaluating factual sufficiency, we must determine whether, after evaluating all the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt.[185] In performing this function, we must take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence or a presumption of guilt," and we must make our own, "independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt."[186] Reasonable doubt, however, does not mean the evidence must be free from conflict.[187]

The elements of false official statement are: (1) that the accused made a certain false official statement; (2) that the statement was false; (3) that the accused knew it to be false at the time of making it; and (4) that the accused made the statement with the intent to deceive.[188]

*2. Appellant's conviction for false official statement is factually sufficient*

Appellant challenges the factual sufficiency of his false official statement conviction arguing that the Government failed to prove beyond a reasonable doubt both that statements at issue were false and that he made them.

The Government charged Appellant with making multiple false official statements to the OOD over a period of time that he was excused from participating in various restriction musters. To prove this specification, trial counsel presented a strong circumstantial case that Appellant made repeated calls to the OOD, while impersonating at least two members of his chain of command,

---

[183] *See Strickland*, 466 U.S. at 689; *Scott*, 81 M.J. at 84.

[184] Art. 66, UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

[185] *Turner*, 25 M.J. at 325.

[186] *Washington*, 57 M.J. at 399.

[187] *United States v. Lepresti*, 52 M.J. 644, 648 (N-M. Ct. Crim. App. 1999).

[188] Art. 107, UCMJ.

and making statements that he was excused from restriction muster because he was participating in such events as volunteer events and church services. Moreover, these two members of his chain of command, Appellant's OIC and SNCOIC, each testified credibly that they made no such calls to the OOD to excuse the Appellant from restriction musters for these purposes. Thus, we are convinced that the statements at issue were false. Additionally, because Appellant was the only person who could benefit from such statements being made to the OOD, we are convinced that he was the one who made them.

We have carefully reviewed the record of trial, the briefs of counsel, and have given no deference—other than to recognize that the finders of fact heard and saw the witnesses in person—to the factual determinations made at the trial level. Based on that review, we are convinced beyond a reasonable doubt that Appellant committed the offense of false official statement as charged.

## III. CONCLUSION

The findings of guilty with regard to Specification 2 of Charge I (sexual assault) and Specification 4 of Charge I (abusive sexual contact), and to Charge I, as listed on the original charge sheet, and the sentence are **SET ASIDE**. All remaining findings are **AFFIRMED**. A rehearing is authorized.

Senior Judge STEPHENS and Judge DEERWESTER concur.

FOR THE COURT:

KYLE D. MEEDER
Clerk of Court